# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00396-CR

---

**Richard Howard Jenkins, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 80904, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Richard Howard Jenkins was convicted of the offense of injury to a child and sentenced to twenty-five years' imprisonment. *See* Tex. Penal Code §§ 12.32, 22.04. The victim was Jenkins's two-month-old daughter, G.J.[1] In two issues on appeal, Jenkins contends that there was insufficient evidence to support his conviction and that there was error in the portion of the jury charge setting out the instructions for transferred intent. We will affirm the trial court's judgment of conviction.

## BACKGROUND

Jenkins and Mother were romantically involved during the time in question, and in December 2018, Mother gave birth to G.J. On February 27, 2019, Mother's friend ("Friend")

---

[1] Because she was a minor when the alleged offense occurred, we will refer to the victim by using a pseudonym and refer to her family members other than Jenkins by their relationships to her. *See* Tex. R. App. P. 9.10 (defining sensitive information).

drove t.o Mother and Jenkins's home to pick up Mother and drive her to an employment office. When Mother left, Jenkins and G.J. remained in the home. After dropping Mother off, Friend went to an appointment nearby. While Mother was at the employment office, she received a text message from Jenkins saying that G.J. had stopped breathing. After texting Mother, Jenkins called 911.

In response to the 911 call, a police officer drove to Jenkins and Mother's home. Once he entered the home, the officer saw Jenkins holding G.J., who was not breathing, and the officer performed cardiopulmonary resuscitation ("CPR") until Emergency Medical Services ("EMS") arrived and transported G.J. to the hospital. Another officer responded to the scene shortly thereafter. While both officers were in the house, Jenkins talked with Mother on the phone, and the second officer arranged for someone to drive Mother home. Both officers talked with Jenkins after G.J. was transported to the hospital, and Jenkins told the officers that he discovered G.J. unconscious and not breathing and that it appeared that she had vomited before he found her. Jenkins related that he had performed CPR on G.J. before the police arrived.

One of the responding officers' body cameras recorded the interaction with Jenkins. On the recording, Jenkins said that G.J. had been eating that morning and stopped about fifteen minutes before the police arrived. Further, he told the officers that G.J. was on the bed when he went to the restroom, that he was not in the restroom for very long, and that he noticed that G.J. was not breathing when he got out of the restroom. Jenkins related that he started performing CPR, that milk started coming out G.J.'s mouth, and that Mother must not have burped G.J. before she left. Additionally, Jenkins admitted that the only people in the home were Mother, G.J., and him.

2

A police detective went to the hospital as part of her investigation and learned that G.J. had died before arriving there. The detective left the hospital and drove to Mother and Jenkins's home. When the detective arrived, Jenkins told her that Mother left earlier that day to go to the employment office, that Mother had placed G.J. on a bed on her stomach before leaving, that he went to the restroom for about an hour, and that he saw vomit near G.J. when he got out of the restroom. Jenkins told the detective that he noticed that G.J. was not breathing when he went to clean her.

The detective arranged for Mother and Jenkins to come to the police station for an interview later that day. At the interview, Jenkins told the detective that G.J. had "consumed too much [formula] and had died from that," and Jenkins and Mother both denied that G.J. had suffered any type of head injury. Jenkins and Mother went home after the interview. The detective observed the autopsy performed on G.J., and the resulting autopsy report stated that G.J. died from "[b]lunt force trauma to the head."

After receiving the autopsy report approximately one month after G.J. died, the detective drove to Jenkins and Mother's home and talked with Mother. Mother told the detective that Jenkins and she had been arguing before G.J. died, that Jenkins opened the front door, and that the door hit G.J.'s head. The detective arranged for another interview with Mother and Jenkins a few days later and offered to give them a ride. When the detective went to pick up the couple, no one was at their home, and Mother did not answer her phone. The detective went back to the home two days later, but no one was there. As part of the investigation, the detective obtained a search warrant for the front door to the home, removed the door, and transported it to the police station so that reenactment testing could be performed.

While the investigation was ongoing, the police received a 911 call regarding a suspicious person at a fast-food restaurant. When the officers arrived, they recognized Jenkins. Jenkins ran from the restaurant and left his belongings behind. In April 2019, Jenkins walked into the police station and asked to talk to the detective. The detective recorded their conversation.

On the recording, Jenkins admitted that he ran from the fast-food restaurant because he got scared after seeing the police. At the beginning of the interview, he denied arguing with Mother on the day in question and denied ever being violent with Mother; however, he later admitted that he had been arrested for assaulting Mother. The detective informed Jenkins that Mother previously told the police that G.J. was injured when he opened the front door to their home and struck G.J. with the lock on the door while Mother was holding G.J. Jenkins told the detective that G.J. was not injured by the door and instead informed the detective that G.J. was accidentally injured while he was arguing with Mother. Specifically, he explained that Mother and he were arguing on the day before G.J. died, that Mother was trying to leave the home while holding G.J., that the argument turned physical when he tried to stop Mother from leaving, that he hit Mother in the face, that Mother's lip started to bleed, and that his hand later contacted G.J.'s head. He described the contact as not being very hard, but he also said that he noticed G.J. had an injury and swelling on her head and began "excessively crying" and acknowledged that his striking G.J. resulted in her death. He said that his actions were wrong, that he had been asking for and praying for forgiveness, and that he does not know why Mother and he did not take G.J. to the hospital after noticing the injury to G.J.'s head. Finally, he stated that he felt better after confessing and agreed to provide a written statement explaining what happened.

The statement Jenkins wrote provided as follows:

On the 26th of Feb. our baby  [G.J.] was struck by me accidently when me and my girlfriend [Mother] were arguing because she wanted to leave and take our baby next door to our neighbor's Apt. and I refused, and that's when our baby's head was struck accidently.  I didn't intend for our baby to be harmed in any way, and we later received the report that our baby suffered a fracture in her brain.

Jenkins told the detective that his written statement accurately reflected what had happened and that he felt better about having been honest about the incident.  Additionally, Jenkins denied that G.J. was hit by a door.

Jenkins left the police station after providing his statement.  The detective later obtained an arrest warrant for Jenkins, and she and other police officers went to Jenkins's home to arrest him in June 2019.  When the police arrived at the home, a police sergeant walked to the back of the house.  Jenkins walked out the back door, and the sergeant arrested him.  Following his arrest, Jenkins asked to speak with the detective again.  That exchange with the detective was recorded by her body camera.

In the recording, Jenkins told the detective that he was not trying to run away from the police when they came to arrest him by going out the back door to his home and was instead trying to throw a bottle away in a dumpster.  He said repeatedly that G.J. had been injured after a door hit her, but he also admitted that he hit G.J. during a fight with Mother and then treated G.J.'s wounds.  Although he stated that he did not intend to hit G.J. and acknowledged knowing that G.J. had been injured, he told the detective that he did not call 911 because he did not think it was necessary and because he did not want to risk going to jail.

During the trial, the recordings of Jenkins's interviews with the police and his written statement were admitted as exhibits and published to the jury.  Additionally, the State

5

called the following witnesses: Friend, the two officers who responded to the 911 call concerning G.J., the detective, the sergeant, and a medical examiner. Those witnesses testified regarding the events set out above and provided additional testimony as discussed below. During his case-in-chief, Jenkins elected to testify.

The medical examiner testified that he was familiar with the autopsy performed on G.J. and the accompanying findings. When describing the findings, the examiner explained that G.J. had a skull fracture on the left side of her head towards the top, had patchy hemorrhages on the surface and undersurface of her brain, and had brain swelling. Further, the examiner stated that the hemorrhages on the left and right sides were recent. Additionally, the examiner explained that G.J. died from a "[b]lunt force injury to the head" associated with the skull fracture and its subsequent effects. The examiner estimated that the injury occurred within 24 hours of the time of death.

When describing the symptoms that G.J. might have been experiencing before her death, the examiner related that she could have lost consciousness, experienced seizures, been irritable, had pain, and vomited. Moreover, the examiner related that a child's body stiffening and having no bend in the extremities could be a manifestation of a seizure. Next, the examiner ruled out the possibility of G.J.'s death being caused by a toxin, a genetic condition, or an infection; instead, the examiner related that the cause of death was homicide, which the examiner described as death caused by the hands of another person. During his cross-examination, the examiner agreed that there was no indication of an earlier fracture and that G.J. was not malnourished. The autopsy report concluded that G.J. "died as a result of blunt force injury to the head" and that "[b]ased on investigative information, including transcripts of law

6

enforcement interviews, the suspect struck the decedent in the head with his fist in an attempt to strike the decedent's mother."

In her testimony, Friend discussed driving Mother to the employment office on the day that G.J. died. Additionally, Friend explained that the day before G.J. died, she drove Mother, Jenkins, and G.J. to the food bank. While Jenkins and Mother were inside the food bank, Friend stayed in the car to care for G.J. Friend recalled that G.J. started screaming; that "her body got stiff, like her arms stretched out straight and her legs was straight"; that she was "spazzing out"; and that she had "bubbles in her mouth." Friend believed that G.J. had a medical episode or a seizure and did not see any injuries on G.J. Next, Friend related that G.J. stopped crying and appeared to be "in a daze." Friend told Mother and Jenkins about the incident, and Jenkins was "nonchalant" and unconcerned.

Additionally, the first responding officer testified that while he was at Jenkins's home, Jenkins was on the phone with Mother but referred to Mother as his friend with a different name. The officer thought it was suspicious that Jenkins was trying to conceal whom he was speaking with on the phone. Further, the officer described G.J.'s body as being "lukewarm." The second officer also testified that G.J. did not feel warm, which the officer thought was unusual because a body will stay warm if the person has been unconscious for a short period and because Jenkins told the officers that he found G.J. fifteen minutes before the officers arrived. The officer commented that Jenkins changed his story about what happened to G.J. and that Jenkins was "[v]ery calm and stoic," which seemed unusual given that his child was having a cardiac issue.

In her testimony, the detective recalled not seeing any obvious signs of trauma on G.J. Further, the detective testified that Jenkins's explanations about what happened on the

7

day of the incident were not consistent and that Jenkins had a difficult time describing what happened. However, the detective agreed that Jenkins could have been suffering from trauma. Additionally, the detective explained that Jenkins's initial statement regarding G.J.'s having died from consuming too much formula was inconsistent with the autopsy results. Regarding the door from Jenkins's home, the detective testified that attempts to reenact with Mother the events as described by Jenkins and Mother did not support their claims that a door had caused G.J.'s injuries. During her cross-examination, the detective explained that Jenkins appeared to have average intelligence and described himself that way. Further, the detective testified that Jenkins had a difficult time listening. The detective explained that although Jenkins told her that G.J. was injured by a door, he previously denied that the door was the cause.

When testifying, Jenkins said he did not realize there was anything wrong with G.J.'s head on the day she died. Regarding the morning of G.J.'s death, he recalled that Mother fed G.J., that Mother woke him up when she left for the employment office, that G.J. was asleep at the time, that he went to the restroom for an hour, and that G.J. spat up formula because Mother did not burp G.J. properly. Concerning G.J.'s injuries, he testified that G.J. was injured during an argument between Mother and him and that Mother hit G.J.'s head on the door when she tried to leave the home with G.J. in a hurry. According to Jenkins, Mother realized that G.J. had been injured but just put her in bed. Jenkins testified that he did not want Mother to get in trouble when he first talked with the police.

During his cross-examination, Jenkins agreed that G.J. died from a skull fracture that resulted in bleeding and swelling in the brain and that G.J.'s drinking formula did not cause the skull fracture. Further, he admitted that he provided multiple accounts of what happened and that the different explanations could not all be true. He testified that he suffered from several

8

mental illnesses and tried his best to explain to the police what happened. Regarding his initial statement to the police in which he did not mention a head injury, he explained that he did not know at that time that the baby had suffered a skull fracture. Jenkins testified that he saw G.J.'s head hit the door when Mother attempted to leave the home but did not believe the baby had been seriously injured; however, he agreed that he did not tell the responding police officers or EMS about G.J.'s potentially having a head injury.

In addition, Jenkins admitted that he told the police during one of his interviews that he struck G.J. and that Mother and he had been in a fight in which they had assaulted one another; however, he claimed that he did not actually hit G.J. He agreed that there was evidence consistent with G.J.'s being punched by an adult and that hitting a two-month-old's head with an adult fist could cause blunt force trauma. Further, he conceded that the only people present in the home in the twenty-four hours leading up to G.J.'s death were Mother, G.J., and him and that he was the only person who had admitted to punching G.J. Jenkins acknowledged leaving his belongings behind at a fast-food restaurant when the police were looking for him, but he denied using the back door of his house as an attempt to get away from the police on the day that he was arrested; instead, he related that he went out the back door when the police arrived to throw something away in the dumpster.

On redirect, Jenkins testified that he had taken special education classes in school and did not understand many of the terms used by the State in its questions. Further, he denied ever hitting G.J. in the head. Regarding the hours leading up to G.J.'s death, he testified that Mother had G.J. in another room with her while he slept and that Mother was awake with G.J. for several hours before leaving the home. Jenkins related that Mother did not report anything being wrong with G.J. when she left the home on the morning of G.J.'s death and that she did not

9

call 911; he asserted that he was the only person to notice anything wrong with G.J. and do something about it.

After considering the evidence presented at trial, the jury convicted Jenkins of the offense of injury to a child.

## DISCUSSION

In his first issue on appeal, Jenkins contends that the evidence was insufficient to support his conviction for the offense of injury to a child. In his second issue, he argues that there was error present in the jury-charge instruction pertaining to transferred intent.

### Sufficiency of the Evidence

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.— Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

10

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014).

As charged in this case, under the Penal Code, a person commits the offense of injury to a child if he "intentionally [or] knowingly . . . by act . . . causes to a child . . . serious bodily injury," and the term "child" under that provision means "a person 14 years of age or younger." Tex. Penal Code § 22.04. Although the victim in this type of offense is a child, the culpable mental state does not apply "to the age of the victim." *Zubia v. State*, 998 S.W.2d 226, 226, 227 (Tex. Crim. App. 1999). The legislature has defined "'[b]odily injury'" as meaning "physical pain, illness, or any impairment of physical condition," Tex. Penal Code § 1.07(a)(8),

and "'[s]erious bodily injury'" as meaning, in relevant part, "bodily injury that creates a substantial risk of death or that causes death," *id.* § 1.07(a)(46).

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the conduct." Tex. Penal Code § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b); *see also Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022) (noting that injury to child is result-oriented offense). "Intent can be inferred from the acts, words, and conduct of the accused," *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), and can be inferred from the surrounding circumstances, *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

Under the doctrine of transferred intent, "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: (1) a different offense was committed; or (2) a different person or property was injured, harmed, or otherwise affected." Tex. Penal Code § 6.04(b). That doctrine applies to injury-to-a-child cases. *Thompson v. State*, 236 S.W.3d 787, 800 (Tex. Crim. App. 2007); *see also Zubia*, 998 S.W.2d at 227 (agreeing with court of appeals that injury-to-child statute "does not require the State to prove [the appellant] had intent or knowledge in connection with the victim's age" and State could "prove its case relying on transferred intent" (quoting *Zubia v. State*, No. 08-96-00096-CR, slip op. at 6-7 (Tex. App.—El Paso March 19, 1998) (not designated for publication))). If a defendant intended to commit bodily injury, "the intentional culpable mental state would 'transfer' to the serious bodily injury actually committed." *Thompson*, 236 S.W.3d at 793. If a defendant was aware that his conduct

12

would likely result in injury and then did result in serious bodily injury to a child, the culpable mental state is transferred to the offense of injury to a child. *See Bravo v. State*, 471 S.W.3d 860, 868 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

In this issue, Jenkins presents separate groups of arguments attacking the sufficiency of the evidence. First, he argues that the evidence was insufficient to establish that he intentionally or knowingly acted in a manner that caused serious bodily injury. Although he acknowledges that a defendant's mental state for a crime involving an intended victim can be transferred to a crime involving another victim, he urges that the jury could not have concluded that happened in this case because the evidence did not establish that he "intentionally or knowingly intended to cause bodily injury to" Mother. Instead, he contends that the evidence showed that "he was trying to stop [Mother] from leaving the house, presumably by putting his arm out to stop her from leaving, not to cause her bodily injury." Based on the preceding, he suggests that the evidence pertaining to his culpable mental state concerning Mother established, at most, that he acted in a criminally negligent or reckless manner, and he contends that criminally negligent or reckless mental states cannot be transferred to establish the intentional or knowing mental states for the offense of injury to a child. As support for these arguments, he highlights that he did not specifically admit in his interviews to intentionally or knowingly trying to cause bodily injury to Mother, and he points to testimony from witnesses explaining that they did not see any visible injuries on G.J.

Next, Jenkins argues that there was insufficient evidence to prove that his alleged striking of G.J. was the but-for cause of her death.[2] Specifically, he suggests that his recanted

---

[2] In this set of arguments, Jenkins refers to arguments made by the State in its closing and to testimony from his trial attorney given at a hearing on his motion for new trial as support for

13

admission was insufficient to establish causation. Further, he contends that the testimony of the medical examiner and the accompanying autopsy report did not establish causation because they were based on his prior but recanted admission to striking G.J. and could not independently establish causation. In a related argument, Jenkins postulates that under the corpus delicti rule the evidence was insufficient because "there [wa]s no evidence outside of [his] admissions that show[ed] the crime actually occurred," corroborated his confession, or established that the essential nature of the offense occurred. Moreover, he emphasizes that there was evidence "that he ha[d] a history of special education and overall lower intellectual functioning" and that the rule was designed to protect "vulnerable defendants" like himself.

Initially, we note that Jenkins's sufficiency challenge is framed as though he could have been found guilty only through the jury's determining that his intent had been transferred. However, the jury could have convicted him without also determining that his intent had been transferred. Moreover, based on the evidence presented at trial, including his admission to striking G.J., his being in charge of her care before her death, and his behavior both before and after her death, and based on the inferences that the jury could have made from that evidence, the jury could have reasonably found Jenkins guilty without relying on transferred intent. *See Bridges v. State*, No. 05-05-00607-CR, 2006 WL 552391, at *2-3 (Tex. App.—Dallas Mar. 8, 2006, no pet.) (op., not designated for publication) (determining that evidence was sufficient to support conviction where evidence showed that child was placed in defendant's care and where defendant's story about what happened to child did not fit injuries); *Bryant v. State*,

---

his assertion that evidence concerning causation was weak in this case. However, neither of those arguments were evidence that the jury could have considered at trial. *See Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (noting that "the arguments of the parties are of no consequence" in sufficiency review "because arguments are not evidence" and that appellate court's relying "on such in a legal-sufficiency analysis" would be error).

14

909 S.W.2d 579, 581-83 (Tex. App.—Tyler 1995, no pet.) (concluding that evidence was sufficient where child suffered trauma "to her skull[] and a brain hemorrhage" from blow to head, where testing ruled out other causes of death, where child was placed in defendant's care, and where defendant provided inconsistent accounts of what happened). In any event, because the briefing in this case relies on transferred intent and because we conclude that the evidence was sufficient under that theory, we will consider that concept in our sufficiency analysis.

Turning to the corpus delicti rule, we note that rule "is a judicial rule of evidentiary sufficiency 'affecting cases in which there is an extrajudicial confession.'" *Shumway v. State*, 663 S.W.3d 69, 75 (Tex. Crim. App. 2022) (quoting *Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015)). In essence, it provides that "[w]hen a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the essential nature of the offense was committed." *Miranda v. State*, 620 S.W.3d 923, 928 (Tex. Crim. App. 2021) (quoting *Miller*, 457 S.W.3d at 924). "Under the *corpus delicti* rule, the corroborating evidence does not need to independently prove the crime, but must simply make the occurrence of the crime more probable than it would be without the evidence." *Shumway*, 663 S.W.3d at 75.

The rule is designed to prevent someone from being convicted "solely on his own false confession to a crime that never occurred." *Carrizales v. State*, 414 S.W.3d 737, 740 (Tex. Crim. App. 2013). Stated differently, "the rule provides essential protection for those defendants who would confess to an imaginary crime because of mental infirmity or for other reasons." *Miller*, 457 S.W.3d at 926. The corpus delicti of a particular offense is simply "the fact that the crime in question has been committed by someone." *Fisher v. State*, 851 S.W.2d 298, 303 (Tex.

15

Crim. App. 1993). "It does not require proof that the specific defendant committed the criminal act, just that the crime itself occurred." *Shumway*, 663 S.W.3d at 75.

Even though Jenkins challenges the evidentiary value of the medical examiner's testimony and the autopsy report because the examiner relied on his confession when determining that he caused G.J.'s injuries, the examiner also testified that G.J. had a skull fracture, hemorrhages in the brain, and swelling of the brain that were caused by a "[b]lunt force injury to the head." Further, the examiner stated that the symptoms Friend observed G.J. displaying the day before her death—e.g., seizure-like stiffening of the extremities—were consistent with a head injury and that the fatal injury sustained by G.J. occurred within 24 hours of her death. Moreover, the examiner related that the autopsy eliminated other causes of death such as poisoning, an infection, malnourishment, and genetic causes. The examiner also explained that the results of the autopsy showed that G.J.'s death was a homicide caused by the hands of another person. Additionally, photos from the autopsy were admitted into evidence and showed injuries described by the examiner.

This evidence was sufficient to establish the corpus delicti of the offense of injury to a child. *See Butts v. State*, 835 S.W.2d 147, 150-51 (Tex. App.—Corpus Christi-Edinburg 1992, pet. ref'd) (rejecting argument that evidence did not "show that an offense occurred" as required by corpus delicti rule and noting as sufficient testimony from doctor that child's injuries were caused by intentional act perpetrated by adult based on characteristics of injury and degree of force needed to cause injury); *see also Enjeti v. State*, No. 05-09-00095-CR, 2010 WL 1665272, at *7 (Tex. App.—Dallas Apr. 27. 2010, pet. ref'd) (op., not designated for publication) (noting that testimony from medical personnel concerning child's injuries and

16

photos of injuries were some independent evidence tending to show that offense occurred, corroborated defendant's extrajudicial confession, and satisfied corpus delicti rule).

Although Jenkins provided various explanations to the police regarding G.J.'s injuries and although he testified at trial that G.J. was injured by a door as Mother tried to leave their home, the jury was tasked with resolving conflicts in the evidence. *See Stahmann*, 602 S.W.3d at 577; *see also Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (explaining that factfinder "was free to disregard appellant's self-serving testimony"); *Hill v. State*, 883 S.W.2d 765, 770 (Tex. App.—Amarillo 1994, pet. ref'd) (noting that although individual "said he did not realize he had injured Jason that badly, the jury . . . was free to reject Marvin's belated and self-serving attempt to conceal his intent"). In resolving the conflicts, the jury was aided by the testimony of the detective who explained that reenactment efforts undertaken in the case did not support Jenkins's claim that G.J. was injured by the door.

Further, in his written statement to the police and in his interviews with the detective, Jenkins admitted to being the cause of G.J.'s injuries. *See Skidmore v. State*, 838 S.W.2d 748, 751-52 (Tex. App.—Texarkana 1992, pet. ref'd) (noting that inference of intent to cause serious bodily injury can be shown by evidence of injuries to child coupled with accused's admission that he had "beaten" child). Specifically, he wrote that G.J. "was struck by me accidentally" while he was arguing with Mother and while she was trying to leave with G.J. According to his statement, Jenkins "refused[] and that's when our baby's head was struck accidentally." *See* Tex. Penal Code § 6.04 (providing that "[a] person is criminally responsible if the result would not have occurred but for his conduct"). From these statements, the jury could have reasonably inferred that Jenkins admitted both to attempting to strike Mother for the purpose of preventing her from leaving their home and to striking G.J. instead. *See Delacerda v.*

17

*State*, 425 S.W.3d 367, 397 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (noting that transferred intent applies when defendant with required culpable mental state intends to harm or injure one person but injures or harms another instead).

Moreover, Jenkins admitted in his testimony that Mother and he assaulted each other during a fight. He also admitted in one of his interviews with the detective that he hit Mother in the face, which caused her lip to bleed, before hitting G.J. and admitted during the same interview that he had previously been arrested for assaulting Mother, which the jury could have relied on when determining Jenkins's mental state when trying to hit Mother.

Additionally, although witnesses testified that they did not see visible injuries on the outside of G.J.'s body, Jenkins admitted during an interview with the detective that he noticed that G.J.'s head was swollen after he hit her, and the medical examiner explained that G.J. died from blunt force trauma to the head causing a skull fracture, hemorrhages in the brain, and swelling of the brain. *See Morales v. State*, 828 S.W.2d 261, 265 (Tex. App.—Amarillo 1992) (explaining that inference of intent to cause serious bodily injury can be shown by evidence of significant force applied to produce severe injuries to child), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993). Further, the jury was able to view photos of the injuries taken as part of the autopsy. *See Goulart v. State*, 26 S.W.3d 5, 11 (Tex. App.—Waco 2000, pet. ref'd) (determining that evidence was sufficient to support conviction for injury to child based on, among other things, photos of injuries to child). From this evidence, the jury could have reasonably determined that G.J. suffered serious bodily injury, *see* Tex. Penal Code § 1.07(a)(46), and reasonably inferred that Jenkins had intentionally or knowingly wanted to apply that same amount of force against Mother.

Moreover, the evidence showed that after Jenkins called 911, he provided various inconsistent accounts of what happened, including that G.J. aspirated on formula and that she was injured by a door. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting that providing "inconsistent statements[] and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt"). Additionally, the two responding officers testified that G.J.'s body was not warm when they arrived, and one of the officers testified that the body should have been warm if G.J. had only been unconscious for a short time before the officers responded. *See Yost v. State*, 222 S.W.3d 865, 874-75 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (noting that jury could reasonably infer that person had died some time before emergency personnel arrived, in part, due to fact that "her body was cold"). Jenkins also told the detective in an interview that he did not call 911 despite knowing that she was injured because he did not want to risk being sent to jail for his conduct. The jury could have reasonably inferred based on this evidence and on Friend's testimony that Jenkins was unconcerned about G.J.'s medical incident the day before that Jenkins delayed reporting the incident to the police. *See Hughes v. State*, No. 07-22-00255-CR, 2023 WL 4881930, at *3 (Tex. App.—Amarillo July 31, 2023, no pet.) (mem. op., not designated for publication) (explaining that jury could infer that defendant "was aware something was wrong with her daughter and still deliberately delayed calling 911").

The second responding officer also testified that Jenkins's calm demeanor following G.J.'s cardiac incident seemed unusual. *Cf. Stevens v. State*, 234 S.W.3d 748, 778-81 (Tex. App.—Fort Worth 2007, no pet.) (determining that evidence was sufficient to support conviction for capital murder of two-year-old and noting in analysis that defendant "showed a lack of emotion" on day of death).

19

Further, the detective testified that after G.J. died, Jenkins ran from the police and left his belongings when the police saw him at a fast-food restaurant, and Jenkins admitted at trial to acting in that manner after seeing the police looking for him. Moreover, Jenkins told the detective during an interview that he fled because he became afraid after seeing the police at the restaurant. *See Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995) (noting that evidence of flight is "a circumstance from which an inference of guilt may be drawn"). Similarly, although Jenkins denied at trial and in an interview that he tried to flee from his home on the day of his arrest, the sergeant who arrested him testified that Jenkins went out the back door when the police arrived at his home.

Given the preceding, we conclude that the evidence was sufficient to establish that Jenkins caused the serious bodily injuries that G.J. sustained, that he possessed the requisite intentional or knowing culpable mental state through transferred intent, and that he was guilty of the offense of injury to a child. *See* Tex. Penal Code § 22.04; *see also Childress v. State*, Nos. 03-16-00535—00537-CR, 2018 WL 454774, at *4 (Tex. App.—Austin Jan. 12, 2018, pet. ref'd) (mem. op., not designated for publication) (noting that intent required for offense was supported under "theory of transferred intent").

For these reasons, we overrule Jenkins's first issue on appeal.

**Jury Charge Error**

In his second issue on appeal, Jenkins contends that there was error in the jury charge instruction pertaining to transferred intent. Specifically, Jenkins notes that although the abstract portion of the charge included the transferred-intent language found in subsection 6.04(b) of the Penal Code, the application portion of the charge did not include language

20

informing the jury about how it could apply the concept of transferred intent to the facts of this case. The relevant portion of the abstract section provided as follows:

CULPABLE MENTAL STATES

The following definition applies to the mental state in causing "serious bodily injury"

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked, is that:

l) a different offense was committed, or

2) a different person or property was injured, harmed, or otherwise affected.

Although Jenkins acknowledges that he did not object to the absence of the language in the application paragraph, he asserts that this Court should still reverse his conviction because he was harmed by the omission.

In preparing a jury charge, a trial court must deliver to the jury a written charge distinctly setting forth the law applicable to the case. Tex. Code Crim. Proc. art. 36.14. Jury instructions must apply the law to the facts adduced at trial and conform to the allegations in the indictment. *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012). "Jury charges contain both an abstract section and an application section." *See Torres v. State*, 691 S.W.3d 138, 147 (Tex. App.—Austin 2024, pet. ref'd). The abstract portion of a charge serves as a glossary to explain the meanings of concepts and terms used in the application paragraphs of the

21

charge but "does not authorize conviction on its own." *Id.* "The application paragraph is the portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the facts and indictment allegations of a given case." *Id.* "The application portions allow the jury to convict a defendant of a particular offense." *Id.*

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm. *See Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). In reviewing a charge for alleged error, we examine the charge as a whole rather than as a series of isolated and unrelated statements. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995).

A trial court's charge to the jury must include not only an abstract statement of the law but also an application of the law to the facts in the case. Tex. Code Crim. Proc. art. 36.14; *Gray v. State*, 152 S.W.3d 125, 127-28 (Tex. Crim. App. 2004). The omission of the application portion of the charge is error. *Gray*, 152 S.W.3d at 128. Regarding transferred intent, the Texas Pattern Jury Charges suggest including both an abstract instruction and an application instruction on the law of transferred intent. *See Committee on Pattern Jury Charges*, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Culpability* ("CPJC") chs. 6.9, .11 (2024); *see also Lozano v. State*, 706 S.W.3d 429, 458 (Tex. App.—Austin 2024, no pet.) (relying on pattern jury charges when addressing jury-charge error). The suggested application paragraph in the Pattern Jury Charges instructs the jury that it could find the defendant guilty of an offense if the defendant caused an injury to a person through the alleged actions and either (1) had the requisite culpable mental state regarding causing the injury to the person or (2) had the requisite culpable mental state regarding causing the injury to a third person. *See* CPJC

22

ch. 6.11.  Based on the preceding, we conclude that it was error for the trial court to include in the abstract section an instruction on transferred intent but "not include an application paragraph on the law of transferred intent."  *See Bell v. State*, 169 S.W.3d 384, 397 (Tex. App.—Fort Worth 2005, pet. ref'd).

Once an appellate court determines that there was error in a jury charge, it must then consider whether the defendant was harmed by the error.  *See Torres*, 691 S.W.3d at 151. The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court."  *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd).  If no objection was made, as in this case, a reversal is warranted only if the error "resulted in 'egregious harm.'"  *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

Ordinarily, in assessing harm, appellate courts "consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record."  *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). However, "[t]he purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm," *Swearingen*, 270 S.W.3d at 813, and "reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm to" the defendant, *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015).  "Egregious harm is a difficult standard to meet."  *Sandoval v. State*, 665 S.W.3d 496, 528 (Tex. Crim. App. 2022) (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)).  For the reasons set out below, we conclude that Jenkins was not egregiously harmed by the omission.

"A charge on transferred intent is by its nature favorable to the State and detrimental to the defendant."  *Garrett v. State*, 642 S.W.2d 779, 781 (Tex. Crim. App. 1982).

23

Its omission from a charge imposes a greater burden of proof on the State, *see id.*, because an instruction applying the law of transferred intent expands the ways in which a defendant may be held criminally liable for his actions or inactions, *see* Tex. Penal Code § 6.04(b); CPJC ch. 6.11. Even though "the abstract portion of the jury charge[]" included the statutory language pertaining to the law of transferred intent, the application portion did not include an instruction applying "the law of transferred intent" and, therefore, "did not authorize the jury to convict appellant on the law of transferred intent." *See Day v. State*, Nos. 05-99-00368—00370-CR, 2001 WL 1674224, at *12 (Tex. App.—Dallas Jan. 4, 2002, pet. ref'd) (op., not designated for publication). Accordingly, Jenkins benefitted from the omission. *See id.*; *see also Ruffins v. State*, 691 S.W.3d 166, 180 (Tex. App.—Austin 2024, no pet.) (explaining that instruction that benefitted defendant could not have harmed him); *Walser v. State*, No. 04-95-00509-CR, 1996 WL 411220, at *4 (Tex. App.—San Antonio July 24, 1996, no pet.) (op., not designated for publication) (overruling issue asserting that trial counsel was ineffective for failing to object to omission of law of parties because omission forced State to rely on primary actor theory and did not amount to harm).

Arguably, Jenkins's benefitting from the omission could end the inquiry, *see Day*, 2001 WL 1674224, at *12 (concluding that defendant benefitted from omission without addressing typical harm factors), but applying the usual harm factors similarly persuades us that Jenkins was not harmed in this case.

*Entirety of the Jury Charge*

Regarding the first factor, Jenkins contends that the entirety of the charge weighs in favor of harm because nothing in the charge instructed the jury on how to apply the law of

transferred intent to the facts of this case. Further, Jenkins notes that the law on transferred intent in the abstract section of the charge was included in the "Culpable Mental States" section rather than in a separate "Causation: Conduct and Results" section as the Penal Code refers to the concept of transferred intent. Finally, Jenkins notes that the charge had no instructions related to but-for and concurrent causation as found in subsection 6.04(a) of the Penal Code or related to simple assault causing bodily injury, which he characterizes as the transferred offense.

Initially, we again note that although the abstract included an instruction on transferred intent, the application portion did not specifically authorize the jury to convict under the transferred-intent theory. *See Alegria v. State*, No. 14-14-00806-CR, 2016 WL 93718, at *2 (Tex. App.—Houston [14th Dist.] Jan. 7, 2016, pet. ref'd) (mem. op., not designated for publication) ("We cannot see how the trial court's failure to expand appellant's possible criminal liability was harmful, much less egregiously harmful."). In addition to limiting the State's theory of liability by not including in the application section a specific instruction on transferred intent, the charge further benefited Jenkins by directing that the jury "must also disregard any statement of the attorneys that is inconsistent with the law contained in this charge." *See Stokes v. State*, 74 S.W.3d 48, 51 (Tex. App.—Texarkana 2002, pet. ref'd) (providing that absent evidence to contrary, reviewing courts must presume that jury followed and understood jury instructions).

Even if the jury convicted Jenkins based on transferred intent, we do not believe this factor weighs in favor of harm. First, we do not see how the absence of an instruction for assault causing bodily injury could have led to harm from the omission of an application instruction on transferred intent. Under the law of transferred intent as it pertains to this case, the culpable mental state is what transferred, and the jury charge included definitions on the relevant mental states. Accordingly, the absence of an instruction setting out all the elements of an

25

assault would not have prevented the jury from determining that Jenkins's mental state pertaining to an act aimed at Mother transferred to the act against G.J. Additionally, we fail to see how the absence of an instruction on but-for and concurrent causation could have had any bearing in this case on the failure to include a transferred-intent instruction in the application portion of the charge. The charge here authorized the jury to convict only if it determined, among other things, that Jenkins "cause[d] serious bodily injury to" G.J. Similarly, we do not believe that including an instruction on transferred intent in the section of the abstract labeled "Culpable Mental States" could have caused harm in this context. Although that is not the title of the statutory provision containing transferred intent, the provision is related to culpable mental states because it deals with what a defendant "desired, contemplated, or risked." Tex. Penal Code § 6.04. Moreover, the title that Jenkins suggests should have been included would not have directed the jury to consider the concept of transferred intent any differently. *Cf. Galindo v. State*, 698 S.W.3d 111, 116 (Tex. App.—Eastland 2024, no pet.) (noting that language in body of grand jury charge controls over heading).

Moreover, the transferred-intent instruction included in the abstract was consistent with the statutory language from subsection 6.04(b) and accurately set out the law on transferred intent. *See* Tex. Penal Code § 6.04(b); *see also Bazanes v. State*, 310 S.W.3d 32, 37 (Tex. App.—Fort Worth 2010, pet. ref'd) (noting in harm analysis concerning error in application section that abstract portion of charge "accurately stated the substantive law"). In other words, assuming the jury considered transferred intent, the jury would not have been misled regarding transferred intent after reading the abstract portion of the charge.

For these reasons, we believe that the first factor weighs heavily in favor of a finding of no egregious harm. *Cf. Gelinas v. State*, 398 S.W.3d 703, 708 (Tex. Crim. App. 2013)

26

(plurality op.) (explaining that harm from error in application paragraph can be minimized by inclusion of correct statement of law in abstract section).

*State of the Evidence*

Turning to the second factor, Jenkins argues that the state of the evidence weighs in favor of harm because the State's theory of liability was transferred intent. Further, he notes that his defense was that G.J. was injured due to her accidental contact with a door when Mother tried to leave.

Although Jenkins correctly argues that the State relied on his admission as a way to establish his guilt through transferred intent and although the evidence would have allowed for the inclusion of a complete transferred intent instruction, we fail to see how the state of the evidence could have resulted in harm where the application section of the jury charge required "the jury to only find appellant guilty on a single theory, rather than multiple theories, of culpability." *See Alegria*, 2016 WL 93718, at *2.

Moreover, we note that there was evidence presented at trial and detailed above from which the jury could have found Jenkins guilty even absent transferred intent, including his behavior before and after G.J.'s death and his being alone with and in charge of caring for G.J. before her death. *See Bazanes*, 310 S.W.3d at 37 (noting that guilt could have been inferred from defendant's "conduct, his remarks, and all of the surrounding circumstances"). Additionally, although he later recanted and denied it at trial, Jenkins did admit to hitting G.J., and the jury could have disregarded his assertion that he only hit G.J. accidentally and instead inferred from the injuries and from his prior and subsequent behavior that he intentionally or knowingly hit her. *See Hill*, 883 S.W.2d at 770. Even if the jury relied on the

27

concept of transferred intent to convict, the evidence presented at trial and summarized in the first issue, including his admission to striking G.J. while trying to hit Mother, would have supported a conviction on that basis, and nothing in the evidence presented at trial indicates that the jury would have been confused about how to correctly apply the concept in this case.

Therefore, we conclude that this factor also weighs against a finding of egregious harm. *Cf. Campbell v. State*, 227 S.W.3d 326, 331 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (determining that defendant was not egregiously harmed by alleged jury-charge error, in part, due to strength of State's case).

*Arguments of Counsel*

Regarding the third factor, Jenkins notes that the State emphasized in its opening argument that he admitted that he threw a punch intended for Mother but hit G.J. on the head instead. Further, he highlights that the State discussed transferred intent in its closing and provided an example in which a person would be guilty through that concept if he shot a gun with the intent to shoot one person but missed and shot another person that he did not mean to shoot. Similarly, he points to a portion of the State's closing argument in which the prosecutor stated that the relevant mental states in this case were "intentionally or knowingly, meaning that it had to be his intent or he knew what was going to happen to commit the underlying offense, which is the assault on" Mother and told the jury that the concept "can be confusing." Jenkins contends that the State's argument applying the concept to the facts of this case did not provide a correct overview of the law of transferred intent but was the only instruction the jury received about how to apply the principle of transferred intent. Accordingly, he contends that this factor weighs heavily in favor of harm.

28

As Jenkins points out, the State did mention in its opening that he tried to hit Mother but hit G.J. instead. Further, we note that the portion of the State's closing argument providing an example of transferred intent during a shooting provided an accurate example of how transferred intent can occur. Although the State's initial attempt to apply the concept to the facts of this case was not as clear as its shooting example and although the State at this point in its argument described the concept as "confusing," later in its argument, the State more clearly and correctly explained that under the law of transferred intent Jenkins's mental state regarding his attempt to hit Mother could transfer to his striking G.J. Additionally, in its closing, the State referred to the abstract portion of the charge correctly setting out the law on transferred intent. Again, assuming that the jury applied the concept of transferred intent in convicting Jenkins, the State's arguments as a whole would not have confused the jury regarding how to apply the concept. In his closing argument, Jenkins did not mention the concept or challenge the State's explanation of it.

Based on the preceding, we conclude that this factor weighed against a finding of egregious harm. *See Campbell v. State*, 664 S.W.3d 240, 253 (Tex. Crim. App. 2022) (noting that State's argument "undoubtedly helped to remedy the alleged error in the charge"); *French v. State*, 563 S.W.3d 228, 238 (Tex. Crim. App. 2018) (explaining that State's closing argument focused jury's attention in way that rendered charge error harmless); *Gelinas*, 398 S.W.3d at 709 (emphasizing "that jury arguments bear significantly on an *Almanza* analysis").

*Remainder of the Record*

Finally, regarding other information in the record, Jenkins asserts that "[t]he first three factors encompass the relevant considerations and there is nothing additional to consider."

During voir dire, the State briefly discussed the concept of transferred intent and described the concept using the statutory language in subsection 6.04(b). *See* Tex. Penal Code § 6.04(b). Next, the State set out two examples correctly discussing how transferred intent could apply in the context of a shooting and an assault involving the throwing of a bottle. The information provided by the State did not incorrectly inform the jury panel about the concept of transferred intent. *Cf. Fulcher v. State*, 274 S.W.3d 713, 718 (Tex. App.—San Antonio 2008, pet. ref'd) (noting in case in which application paragraph of jury charge did not include mental state element that State informed jury panel during voir dire that it had to prove that defendant acted intentionally or knowingly).

Importantly, "we note that nothing in the record indicates that the jury was confused by the jury charge." *See Torres*, 691 S.W.3d at 154; *see also Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd) (highlighting that "[t]here is no evidence the jury was confused about the instructions in the charge"). For example, the jury did not send any notes to the trial court regarding the jury instructions. *See Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.).

Accordingly, we believe that this factor also weighs against a finding of egregious harm.

Given our resolution of the factors discussed above, we conclude that the jury-charge error did not egregiously harm Jenkins. *See Torres*, 691 S.W.3d at 155 (concluding that defendant was not egregiously harmed where only one factor weighed slightly in favor of harm). Therefore, we overrule Jenkins's second issue on appeal.

## CONCLUSION

Having overruled both of Jenkins's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: July 25, 2025

Do Not Publish